***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby reverses the Opinion and Award of the Deputy Commissioner.
 ************
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing as
 STIPULATIONS
1. The parties were subject to and bound by the North Carolina Workers' Compensation Act as of April 17, 1997, the date of plaintiff's injury by accident giving rise to this claim, and as of February 12, 1998, the date plaintiff's disability began.
2. At all relevant times, an employee-employer relationship existed between the plaintiff and defendant-employer.
3. The workers' compensation insurer is the North Carolina Housing Authority Risk Retention Pool.
4. Plaintiff-employee had an average weekly wage of $561 and a compensation rate of $374.02.
5. Plaintiff contends that she is entitled to compensation for permanent total disability since February 12, 1998.
6. Defendants have denied liability with respect to the plaintiff's psychological problems and plaintiff has received no benefits.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. On the date of the evidentiary hearing, plaintiff was 57 years of age, having a date of birth of February 12, 1943. She is divorced and has four children. She obtained her GED and attended Asheville Community College. Plaintiff has previously worked in a hospital as an orthopaedic nurse.
2. Plaintiff began working for the Asheville Housing Authority as a social worker in 1973. She did her job well and received promotions throughout the years. In 1994, plaintiff began working as a title eligibility specialist. Plaintiff interviewed clients as to their eligibility for public housing assistance and rent adjustments. She continued to perform her job well and got along fine with co-workers.
3. As early as October 1993, plaintiff had been assessed with anxiety by Dr. James McMillan, her family physician. Dr. McMillan prescribed Lorazepan, an anti-anxiety medication. In January 1996, her anxiety was exacerbated when plaintiff's grandson decided to leave college and join the Air Force. In February 1996, she complained to Dr. McMillan of depression, telling him that she had no energy and was not interested in her work. Dr. McMillan diagnosed plaintiff with depression and prescribed Paxil.
4. Prior to April 1997, plaintiff also had multiple physical problems, including obesity, high blood pressure, and degenerative arthritis in her knees. She previously had several surgeries, including a partial hysterectomy, appendectomy, and lumpectomy. As early as 1991 she was on estrogen replacement therapy. In November 1996, Dr. McMillan assessed plaintiff with probable menopausal syndrome.
5. On April 17, 1997, plaintiff sustained a minor injury by accident at work. When plaintiff returned from lunch, a new chair which had been ordered for her was in her cubicle. When she sat in the chair, it rolled out from under her and plaintiff landed on the floor. She was not seriously injured or knocked unconscious. Her co-workers helped her up. Plaintiff was not visibly shaken and actually laughed at herself. She complained only of some neck pain and later about her knee.
6. Plaintiff was seen by Donald M. Mullis, M.D, an orthopaedic surgeon. Dr. Mullis testified that he was treating plaintiff for a right knee problem, for which he had recommended surgery that plaintiff declined, before her April 1997 injury. He saw plaintiff on May 29, 1997, for left knee and left shoulder complaints from falling out of the chair at work. Dr. Mullis observed that plaintiff had pre-existing arthritis in the left knee that may have been aggravated by the fall and that she had subacromial bursitis in her left shoulder. Plaintiff was treated with physical therapy. Dr. Mullis testified that there would be no permanent disability from the injuries and advised plaintiff that he did not need to see her again unless she continued to have problems. She was advised to continue working and to be active. Dr. Mullis testified, and the Full Commission finds, that plaintiff temporarily aggravated her left knee and injured her left shoulder, and that there was no permanent disability or permanent impairment from the knee and shoulder injuries.
7. During the months following her accident, from May through September 1997, plaintiff was regularly seeing Dr. McMillan for various complaints. During these visits, she made no mention of her fall at work.
8. Plaintiff did not sustain any significant injury to her head when she fell from her chair and had no loss of consciousness. The evidence shows that she did not suffer a closed head injury. During her visits to Dr. McMillan from May through September 1997, plaintiff never complained of any head injury. A CT scan done in September 1998 showed unremarkable results.
9. Within a week of the accident, plaintiff had a difficult interaction with William Wynn, the safety coordinator for the Asheville Housing Authority. Mr. Wynn had instituted a program to improve workplace safety. When he heard about plaintiff's accident, Mr. Wynn spoke with plaintiff about her accident report. Plaintiff apparently believed that Mr. Wynn was accusing her of filing a lawsuit against the Housing Authority and she became upset. Renee Crane, a co-worker overheard the conversation and stated that Mr. Wynn was somewhat arrogant in his manner, but, that she did not recall Mr. Wynn stating that a suit was filed. Ms. Crane explained that plaintiff became upset and did not understand what Mr. Wynn was saying. This encounter with Mr. Wynn was upsetting to plaintiff, and Ms. Crane reported it to Constance Proctor, her supervisor.
10. Following her April 17 accident, plaintiff was able to continue performing her duties without any apparent difficulties. Plaintiff, however, began to develop behavioral changes. Without any basis in fact, plaintiff became suspicious that co-workers were watching her and spying on her. In August 1997, she developed a panic disorder.
11. The deputy commissioner who received the lay testimony in this case reported plaintiff's demeanor as follows:
 Plaintiff's behavior and testimony at the hearing was somewhat bizarre. She was tearful at times and testified that after her accident she started believing that people at work were treating her differently, watching her and screening her clients when they arrived. She testified that she believed her co-employees were following her outside of the workplace and calling her on the phone, then hanging up.
Having reviewed the record, the Full Commission agrees with the Deputy Commissioner's assessment concerning plaintiff and finds that this opinion is further supported by the medical records.
12. On September 11, 1997, when she was seen by the Physicians Assistant for Dr. McMillan, plaintiff reported that her employer had requested an evaluation and statement from the doctor's office to the effect that she was emotionally stable, apparently due to some erratic behavior at work. Michael Mayhew, PAC, found no indications of delusions or neuroses, found that plaintiff appeared to be less anxious than before, and wrote a note to that effect.
13. Following the accident, the employer sent plaintiff to Dr. Bruce Kelly with Ravenscroft Family Health Center. On her visit of July 23, 1997, plaintiff's "direct supervisor" went with her to see Dr. Kelly. It appears that they discussed plaintiff's behavior at work with Dr. Kelly. Plaintiff reported the incident with Mr. Wynn, telling Dr. Kelly that she was improperly accused of filing a claim concerning her fall. She acknowledged to Dr. Kelly that she may have reacted with some paranoia. Dr. Kelly did not believe that she had any significant psychiatric difficulty at that time.
14. When Dr. Kelly next saw plaintiff on September 12, 1997, he was aware that her difficulties at work, including her bizarre behaviors, were continuing. He spoke with both plaintiff and her supervisor on that day. Dr. Kelly then contacted Dr. McMillan to discuss his concerns over plaintiff's apparent paranoid ideation.
15. The testimony of plaintiff's daughter, Gwen Hill, also showed that plaintiff's behavior started becoming bizarre around the fall of 1997. Plaintiff began telling her daughter that people at work were treating her badly. She thought that they were tampering with her mail and following her outside of work, even following her when she traveled to Charlotte to visit her daughter.
16. On November 18, 1997, Ms. Hill called Dr. McMillan, and told him that she believed her mother's psychological problems were precipitated by the injury at work. Dr. McMillan suggested a psychiatric evaluation.
17. Anthony Sciara, Ph.D., a psychologist, has treated plaintiff since December 4, 1997. Dr. Sciara has diagnosed plaintiff as paranoid delusional. This condition is permanent and is anticipated to preclude plaintiff from employment. Dr. Sciara explained that plaintiff believes that defendant-employer has people watching her all the time, to the extent that when plaintiff took a trip to San Francisco, California, she reasoned that the Housing Authority probably hired the FBI to follow her. Dr. Sciara explained that these suspicions are not appropriate; but are all paranoid delusions not based in fact. Although Dr. Sciara stated that plaintiff's paranoid delusions were caused by the accident at work and the way it was handled by the employer, he was not able to explain how the accident (the fall in the new chair) caused the injury. Dr. Sciara explained that there was no evidence of a brain or other injury caused by the fall which would produce this condition and that her symptoms were not consistent with a traumatic head injury. In contrast, however, plaintiff was described by Dr. Sciara as a person with a significant moral structure who felt a need to follow the rules, perceived that her employer desired no lost day injuries at work, and that any accident at work would not be acceptable. Further, the perceived nature of the confrontation from Mr. Wynn accusing her of filing some type of legal action against the employer would significantly undermine her psychological stability and contribute to her decompression.
18. Plaintiff was also evaluated and treated by Anthony Weisenberger, M.D., with Charter Asheville, who first saw her on February 20, 1998. Dr. Weisenberger assessed her with an unspecified psychosis and a possible delusional disorder. Dr. Weisenberger found she was disabled from working from a psychiatric standpoint.
19. Plaintiff was also assessed by Terence E. Fitzgerald, Ph.D., who saw her on June 8, 2000, apparently as an independent evaluation requested by the defendants. Dr. Fitzgerald's report was submitted as part of the stipulated medical exhibits. Dr. Fitzgerald assessed plaintiff with a delusional disorder, persecutory-type. It is his opinion that plaintiff's psychiatric decompensation is a direct result of her work-related injury and the administrative management of the claim. Dr. Fitzgerald found that plaintiff was unable to return to work in any capacity.
20. Plaintiff's family doctor, Dr. McMillan, has deferred to the treating psychologists as to opinions regarding plaintiff's psychiatric problems. When asked, he testified that he could not state that plaintiff's anxiety and depression going back to 1996 was associated with her postmenopausal condition.
21. Plaintiff has developed a paranoid delusional disorder. The greater weight of the competent evidence is that the paranoid delusional disorder is related to the employer's investigation of her claim for the April 17, 1997 injury, including plaintiff's perception of her employer's desire for no work injuries and perceived retaliation for being injured on the job. The Commission gives greater weight to the testimony of Dr. Sciara that plaintiff's psychological condition was not caused by a traumatic injury to her head or other injury sustained in the fall. Plaintiff's psychiatric condition was not due to an injury by accident arising out of and in the course of her employment on April 17, 1997. Rather, this condition is the result of the investigation of her claim for that injury or from perceived workplace retaliation for her injury. Plaintiff has not established a psychological injury from an accident or untoward event.
22. Plaintiff tendered her resignation from her employment effective February 13, 1998. She has not returned to work since that date. Although she is physically able to work, she is paranoid delusional and is not able to work from a psychiatric standpoint.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following
 CONCLUSIONS OF LAW
1. On April 17, 1997, plaintiff sustained a physical injury by accident arising out of and in the course of her employment with defendant-employer when she fell from a chair and landed on the floor. As a result, she suffered minor temporary physical injuries to her left knee and left shoulder, which did not result in any permanent impairment or disability. N.C.G.S. §§ 97-2(6), 97-29, 97-30, 97-31.
2. Defendants are responsible for payment for reasonably necessary medical care for plaintiff's left knee and left shoulder injury, including the physical therapy previously prescribed. The evidence does not support any claim for ongoing medical treatment for these injuries. N.C.G.S. §§ 97-2(19), 97-25.
3. Plaintiff has developed paranoid delusional disorder; however, this condition is not the result of the injury by accident arising out of or in the course of her employment, and is not compensable. N.C.G.S. §97-2(6). Psychological injuries resulting from legitimate personnel action, including investigation of workers' compensation claims generally are not compensable under the Workers' Compensation Act. This principle has been expressed in other Commission opinions. E.g., I.C. No. 819168,Grant v. N.C. Dept. of Correction; I.C. No. 844900, Gillenwater v. N.C.Dept. of Transportation. Plaintiff's attempts to categorize her psychological condition as the result of a hostile workplace, including claims for employment discrimination, wrongful termination, or other employment claim does not establish a claim for workers' compensation. Although workers' compensation is often the exclusive remedy for injuries sustained in the course and scope of employment, workers' compensation is not the proper remedy for employment claims for risks which do not arise out of and in the course of employment. Compare N.C. Gen. Stat. §97-10.1 (workers' compensation is exclusive remedy) with Busher v.Southern Food Service, 73 F. Supp.2d 556 (M.D.N.C. 1999) (claim for emotional distress arising from termination and denial of FMLA not precluded by Act); Harrison v. Edison Brothers Apparel Stores, Inc.,724 F. Supp. 1185 (M.D.N.C. 1989) (emotional damage claim based on acts not in the normal course of employment not precluded by Act); Hogan v.Forsyth Country Club, 79 N.C. App. 482, 340 S.E.2d 116, disc. reviewdenied, 317 N.C. 334, 346 S.E.2d 140 (1986) (Act does not preclude action for civil wrongs which are outside the scope of the Act). The Commission makes no finding as to whether the plaintiff has any valid employment claims which are outside the Workers' Compensation Act and acknowledges that its opinion concerning the validity of these actions is immaterial.See Abels v. Renfro Corp., 108 N.C. App. 135, 423 S.E.2d 479 (1992) (Commission's findings concerning compensability of injury irrelevant to § 97-6.1 claim).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay all medical expenses incurred by plaintiff for prior treatment of her left knee and left shoulder injuries as related to her injury by accident of April 17, 1998. Defendants are not responsible for any ongoing medical treatment for these prior physical injuries.
2. Plaintiff's claim for disability or impairment benefits from the left knee and left shoulder injuries are DENIED.
3. Plaintiff's claim for psychological disorder, including paranoid delusions, is DENIED.
4. The parties shall pay their own costs.
 S/_____________________________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/_____________________________ BUCK LATTIMORE CHAIRMAN
S/_____________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER